AE

RECEIVED

NOV 08 2007 aew
NOV 09 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

United States of America ex rel.　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
Theodore Luczak I.D. #B-00780　　　　　　)
(Full name and prison number)　　　　　　　)
(Include name under which convicted)　　　　)
　　　　　　　　　　　　　　　　　　　　　)
PETITIONER　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
Terry McCann　　　　　　　　　　　　　　)
(Warden, Superintendent, or authorized　　　)
person having custody of petitioner)　　　　)
　　　　　　　　　　　　　　　　　　　　　)
RESPONDENT, and　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
(Fill in the following blank **only** if judgment　)
attacked imposes a sentence to commence　　)
in the future)　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
ATTORNEY GENERAL OF THE STATE OF　)
　　　　　　　　　　　　　　　　　　　　　)
Illinois　　　　　　　　　　　　　　　　　)
(State where judgment entered)　　　　　　　)

CASE NO: _____
　　　　　(Supplied by Clerk of this Court)

07cv6375
JUDGE GUZMAN
MAG. JUDGE KEYS

Case Number of State Court Conviction:

89CR067201

### PETITION FOR WRIT OF HABEAS CORPUS -- PERSON IN STATE CUSTODY

1.  Name and location of court where conviction entered: Sixth (6th) Municipal District 16301 S. Kedzie Parkway, Markham, IL 60428

2.  Date of judgment of conviction: February 2, 1990.

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known) 89CR0678201 AGG CRIM SEX ASSAULT - AGG KIDNAPPING - AGG SEX ABUSE

4.  Sentence(s) imposed: _____

5.  What was your plea? (Check one)　　(A) Not guilty　　( )
　　　　　　　　　　　　　　　　　　　(B) Guilty　　　　(X)
　　　　　　　　　　　　　　　　　　　(C) Nolo contendere ( )

　　If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

_____

## PART I -- TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):        Jury ( )              Judge only ( )

2. Did you testify at trial?     YES ( )            NO        ( )

3. Did you appeal from the conviction or the sentence imposed? YES ( )   NO (X)

    (A)  If you appealed, give the

        (1)  Name of court: _____

        (2)  Result: _____

        (3)  Date of ruling: _____

        (4)  Issues raised: _____

        _____

        _____

    (B)  If you did not appeal, explain briefly why not:

    My Attorney told me that I could not seek on appeal

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES ( )      NO (X)

    (A)  If yes, give the

        (1) Result  _____

        (2) Date of ruling: _____

        (3) Issues raised: _____

        _____

        _____

    (B)  If no, why not: I was informed that I could not seek on appeal

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( )  No (X)

    If yes, give (A) date of petition: _____  (B) date *certiorari* was denied: _____

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES (  )    NO (X)

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A.   Name of court:  _____

    B.   Date of filing:  _____

    C.   Issues raised:  _____

                     _____

                     _____

    D.   Did you receive an evidentiary hearing on your petition?   YES ( . )  NO (X)

    E.   What was the court's ruling?  _____

    F.   Date of court's ruling:  _____

    G.   Did you appeal from the ruling on your petition?   YES (  )  NO (X)

    H.   (a) If yes,   (1) what was the result?   _____

                     (2) date of decision:  _____

        (b) If no, explain briefly why not: <u>I was informed that I could not appeal</u>

    I.   Did you appeal, or seek leave to appeal this decision to the highest state court?

        YES (  ) NO (X)

        (a) If yes,   (1) what was the result?  _____

                     (2) date of decision:  _____

        (b) If no, explain briefly why not: <u>I was informed that I could not appeal</u>

2.  With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?   YES (X)      NO ( )

A.  If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

    1.  Nature of proceeding    State Habeas Corpus

    2.  Date petition filed    April 5, 2006

    3.  Ruling on the petition    No Ruling was had

    3.  Date of ruling    July 19, 2006

    4.  If you appealed, what was
        the ruling on appeal?    No Ruling was had

    5.  Date of ruling on appeal   May 18, 2007

    6.  If there was a further appeal,
        what was the ruling ?    Illinois Supreme Court Denied P.L.A

    7.  Date of ruling on appeal ,  September 14, 2007.

3.  With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?
        YES ( )   NO (X)

A.   If yes, give name of court, case title and case number: _____
_____

B.   Did the court rule on your petition?  If so, state

    (1)  Ruling: _____

    (2)  Date: _____

## 4. WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?

**YES ( )   NO (X)**

If yes, explain: ~~None~~ _____
_____

4

## PART III -- PETITIONER'S CLAIMS

1. State briefly every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one Petitioner's Fifth (5th), Sixth (6th) and Fourteenth (14th)
Supporting facts (tell your story briefly without citing cases or law):

Amendments of the United States Constitution have been violated where the court lacked any jurisdiction over the charges by indictment, as the alleged crime was committed in the State of Indiana and not the State of Illinois

I. INTRODUCTION

( See Additional Pages )

(B) Ground two _____
Supporting facts:

5

( )                                    ( )

On, or about, February 2, 1989, the petitioner was arrested and charged with Aggravated Criminal Sexual Assault - Criminal Sexual Assault - Aggravated kidnapping - Aggravated Criminal Sexual Abuse and Unlawful Restraint. On March 23, 1989, the petitioner was presented with an indictment containing said charges. On April 7, 1989, petitioner was arraigned and entered a plea of not guilty. On February 2, 1990, the Honorable John J. Mannion entered a finding of guilty on counts 01 and 02, and sentenced the petitioner to Ten (10) years in the Illinois Department of Corrections.

After completing his sentenced and was placed on two(2) years parole.

On, or about, April 24, 1995, the petitioner was arrested and charged with various sexual assault-related offenses. On May 25, 1995, the petitioner was presented with an indictment under number 95CR1411801, charging him with Aggravated Criminal Sexual Assault - Criminal Sexual Assault - Aggravated kidnapping - Aggravated Criminal Sexual Abuse and Unlawful Restraint. At the petitioner's sentencing, the State introduced the testimony of the alleged victems in case

number 89CRO678201, seeking to inhance the pet-
itioner's sentence; at this time each alleged
victem testified to the fact that the assault
took place in the State of Indiana, as on June
24, 1997, Veronica Gaeta testified to the fact that
the assault took place on 111th street right off of
Indianapolis Boulevard. (See T.R. K-23) Also on
June 24, 1997, Paula Sledge-Coleman, further
testified to the fact that the alleged assault took
place in Beer Can Alley which is on 111th street off
of Indianapolis Boulevard. (See T.R. K-45) Also on
May 15, 1997, Nicole De Lapaz further testified to the
fact that the alleged assault took place off of
Indianapolis. (See T.R. D-176) As a result of said
convictions, the petitioner was given an enhan-
ced sentence of 60 and 40 years. (See T.R. N-38)

Due to the fact that the alleged assaults took
place in the State of Indiana, the sentencing
court in case number 89CRO678801 had no juris-
diction over any of the charges, and as such;
the court in case number 95CR1411801 was
unable to use said convictions to enhance
petitioner's current sentence and as such;
the petitioner is entitled to discharge, as the

range of sentence in case number 95CR1411801 without the use of a prior conviction is from 6 to 30 years

For the convenience of this court, a copy of the Circuit, Appellate and Illinois Supreme Court decisions are included in the Appendix to this petition.

## CONCLUSION

A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction, was not achieved at the expense of the petitioner's constitutional rights. It is clear that the petitioner is in custody by the use of a prior conviction, and that the petitioner's current conviction is also unconstitutional, as petitioner is currently in the Illinois Supreme Court seeking DNA evidence. (See Appendix).

(C)  Ground three _____
     Supporting facts:

_____

_____

_____

_____

_____

_____

_____

(D)  Ground four _____
     Supporting facts:

_____

_____

_____

_____

_____

_____

_____

2   Have all grounds raised in this petition been presented to the highest court having jurisdiction?
    YES (X)   NO (  )

3.  If you answered "NO" to question (16), state briefly what grounds were not so presented and why not:

_____

_____

6

## PART IV -- REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A)  At preliminary hearing  _Stephen S. Sausmen_____

(B)  At arraignment and plea  _Stephen S. Sausmen_____

(C)  At trial  _____

(D)  At sentencing  _____

(E)  On appeal  _____

(F)  In any post-conviction proceeding  _____

(G)  Other (state):  _____

## PART V -- FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES (X)   NO (  )

Name and location of the court which imposed the sentence: _Circuit Court of Cook County_

Date and length of sentence to be served in the future  _100 years_____

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: __11/2/07___                    _Theodore Lugtu_____
            (Date)                          Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

_Theodore Lugtu_____
(Signature of petitioner)
B-00780_____
(I.D. Number)
Route 53, P.O. Box 112, Joliet, IL 60434
(Address)

REVISED 01/01/2001

7

1    STATE OF ILLINOIS )
                      )
2    COUNTY OF C O O K )

3            IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                   COUNTY DEPARTMENT - CRIMINAL DIVISION
4
     THE PEOPLE OF THE      )
5    STATE OF ILLINOIS,     )
                            )
6                           )    Indictment No. 95-14118
            vs.             )    CHARGE: ACSA
7                           )
     THEODORE LUZCAK        )
8                           )

9                    REPORT OF PROCEEDINGS

10   had at the hearing of the above-entitled cause, before
     the Honorable EDWARD M. FIALA, JR., Judge of said
11   Court on the 24th day of June, A. D., 1997.

12
             APPEARANCES:
13

14                          HONORABLE RICHARD A. DEVINE,
                            State's Attorney of Cook County,
15                          by:
                            MR. RAYMOND BROGAN & MR. LINAS
16                          KELECIUS:
                            Assistant State's Attorneys,
17                          on behalf of the People;

18
                            DEFENDANT THEODORE LUZCAK:
19                          appear pro se.

20

21   Helen M. Hackney
     Official Court Reporter
22   2650 South California
     Chicago, Illinois 60608
23

24

K1

1
2
3
4
5
6

I N D E X

June 24, 1997

Sentencing Hearing
Commenced and Continued

Pages K1 through K79

7

LIST OF WITNESSES:                    DX       CX      RDX      RCX

8    Veronica Gaeta                    K18      K31
     Paula Sledge-Coleman             K39      K54
9    Donald Shone                      K61      K74      K76

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4                  V E R O N I C A    G A E T A,

5     the witness herein, called as a witness on behalf of

6     the People of the State of Illinois, having been first

7     duly sworn, was examined and testified as follows:

8

9                         DIRECT EXAMINATION

10                        BY

11                        MR. KELECIUS:

12

13        Q.      Miss Gaeta, I would like you in a loud and

14    clear voice to tell your name and spell your name and

15    please give us your full name, including your maiden

16    name and your current name.

17        A.      Veronica Delgado Ransy Gaeta, G-a-e-t-a.

18        Q.      Miss Gaeta, back in February, 1989, back

19    then you were going simply by the name Veronica Gaeta;

20    is that correct?

21        A.      Yes.

22        Q.      Delgado is now your married name?

23        A.      Yes.

24        Q.      Miss Gaeta, back on February 25th, of 1989,

1      at about 7:30 in the morning were you walking to the

2      bus stop at the three-way intersection of Muskegon,

3      South Chicago and 92nd Street, in Chicago, Illinois?

4          A.      Yes.

5          Q.      How old were you back then?

6          A.      15.

7          Q.      And back then were you going to school?   In

8      general were you going to high school at that time?

9          A.      Yes.

10         Q.      What high school?

11         A.      Bowen High School.

12         Q.      What year in high school were you in at

13     that time?

14         A.      Sophomore.

15         Q.      And, back when you were walking to that bus

16     station on February 25th, 1989, why were you going to

17     the bus stop?

18         A.      I was headed to the math club competition

19     at Kennedy King.

20         Q.      What kind of math club competition was

21     that?

22         A.      What kind?

23         Q.      Yes.

24         A.      It was from the school.  We would meet on

1    Saturday and compete against all the other schools.

2        Q.    Was this actually a competition day?

3        A.    Yes.

4        Q.    As you were approaching that particular bus

5    stop did something happen to you?

6        A.    Yes.

7        Q.    What happened?  What's the first thing that

8    happened?

9        A.    I was stopped.

10       Q.    How were you stopped?

11       A.    I was crossing the street and a car pulled

12   up in front of me.

13       Q.    The car?

14       A.    And blocked my path.

15       Q.    Do you remember what that car looked like?

16       A.    No.  I don't remember now.

17       Q.    Do you remember the color?

18       A.    It could have been white.

19       Q.    And, go --

20   DEFENDANT LUZCAK:  Objection, your Honor.

21   THE COURT:    I will leave that answer stand.

22   MR. KELECIUS:  Q.    What happened when that car

23   pulled in front of you?

24   THE WITNESS:  A.    The passenger door swung open

K20

1    and the man inside pulled me in.

2    Q.    I want you to look around the courtroom

3    right now.  Do you see that man in court right now?

4    A.    Not in front of me.

5    Q.    I'm sorry?

6    A.    Not in front of me.

7    Q.    Stand up, look around the courtroom.  Do

8    you see the man that pulled up into the car?

9    A.    Yeah.

10    Q.    Point him out, please.

11    A.    That's him.

12    Q.    What's he wearing?

13    A.    A beige shirt, tan.

14    MR. KELECIUS:    May the record reflect she had

15    identified the defendant?

16    THE COURT:  Please be seated.  So reflect.

17    MR. KELECIUS:  Q.  Miss Gaeta, how did he pull you

18    into the car after that passenger door swung open?

19    THE WITNESS:  A.  I really don't remember how it

20    happened.  It was so fast.

21    Q.    What happened after he pulled you into the

22    car?

23    A.    He push my head down to the bottom of the

24    car, and he just slammed the door shut, start driving

1    off.

2         Q.    Did he say anything to you around this

3    time?

4         A.    At this point, no.

5         Q.    What did you say to him?

6         A.    I was just screaming, telling him to let me

7    go.

8         Q.    And did the car begin to move?

9         A.    Yes.

10        Q.    How long did the car drive at this point?

11        A.    Maybe ten minutes.

12        Q.    And what were you doing during those ten

13   minutes as the car was driving?

14        A.    I was struggling because he was pulling my

15   hair and keeping my head down.

16        Q.    Was he saying anything to you during those

17   ten minutes?

18        A.    He said we were going to the park.

19        Q.    Did he tell you what park you were going

20   to?

21        A.    Not at that time, no.

22        Q.    Did you say anything to him during this

23   ten-minute ride?

24        A.    No.

1      Q.      What happened after the car drove for about

2   ten minutes?

3      A.      He pulled over, and when I was able to look

4   up I recognized that it was Calumet Park.

5      Q.      What park?

6      A.      Calumet.

7      Q.      Where Calumet Park?

8      A.      It's 111th Street, 111th right off

9   Indianapolis Boulevard.

10      Q.      That is still Chicago?

11      A.      Yes.

12      Q.      How close is that to Indiana?

13      A.      It's right by the border.

14      Q.      When you say you were in Calumet Park that

15   is actually a park?

16      A.      Yes.

17      Q.      And, the part of the park that you were in

18   could you recognize it?

19      A.      Yes.   They blocked it off now.   It's not

20   there any more, but at that time they used to call it

21   Beer Can Alley.

22      Q.      How secluded is Beer Can Alley?

23      A.      It's pretty secluded.   There's tracks right

24   next to it, and cars aren't really allowed in there.

1      Q.      What kind of a road leads to Beer Can

2   Alley; that is a paved road, unpaved road?

3      A.      No.   It's dirt.

4      Q.      What happened when you looked and realized

5   you were in Beer Can Alley?

6      A.      Then that's when he started talking to me,

7   telling me what he was going to do.

8      Q.      What did he say?

9      A.      He said he was going to fuck me.

10     Q.      What happened?

11     A.      And that's when I start struggling.   He was

12   just pulling my hair and trying to hold me down.

13     Q.      And, what did he do as he pulled your hair?

14     A.      Then he started pulling down his pants.

15     Q.      Doing what with his pants?

16     A.      Pulling them down.

17     Q.      His own pants?

18     A.      Yes.

19     Q.      What did he do?

20     A.      Then he pushed me down and told me to --

21   that I had to do oral sex on him.

22     Q.      Were those his words?   What were his words?

23     A.      He told me suck it like a lollipop.

24     Q.      What happened then?

1     A.    I kept telling him no.

2     Q.    So what happened?

3     A.    He just kept pushing my head down.

4     Q.    What happened?

5     A.    I guess he got mad, and then he just pushed

6 me back on the seat and he yanked one of the levers

7 down and it went back.

8     Q.    What went back?

9     A.    The seat.

10    Q.    Let me back up.  Before we get to the seat

11 during the time that he was pushing your head did any

12 part of your body come into contact with his penis?

13    A.    Yes.

14    Q.    What part?

15    A.    My mouth.

16    Q.    And how far into his mouth did he get his

17 penis?

18    A.    He shoved it in.

19    Q.    How long did he keep it in your mouth?

20    A.    A few minutes.

21    Q.    And where were his hands during these few

22 minutes?

23    A.    One was pulling my hair.  I don't know what

24 he was doing with the hair.

1    Q.    Were his hands still or were they moving

2  during the time he was holding your hair?

3    A.    Moving.

4    Q.    How was he moving his hands?

5    A.    He was trying to hold my head down.  I kept

6  trying to push it back up.  He kept pushing me back

7  down.

8    Q.    Now after he folded back the seat tell us

9  what happened then.

10    A.    And then he pulled down my pants and then I

11  kept telling him to stop and then he just went ahead

12  and raped me.

13    Q.    When you say he raped you what did he do?

14    A.    He --

15    Q.    Describe what he did when you use the term

16  rape.  Describe what he was doing, what you mean.

17    A.    He put his penis in me.

18    Q.    In which part of your body?

19    A.    In my vagina.

20    Q.    How long did he have his penis in your

21  vagina?

22    A.    I don't know.

23    Q.    And was he moving or still while he had his

24  penis in your vagina?

K26

1        A.      He was moving.

2        Q.      And, how did that part end?

3        A.      I kept telling him to get up.  He was

4   hurting me.

5        Q.      What was he saying in response to you

6   saying that?

7        A.      He kept saying that if I kept struggling he

8   was going to hurt me some more.

9        Q.      What happened?

10       A.      It was just over.  He threw some towels at

11  me, told me to clean up.

12       Q.      And then what happened?

13       A.      And then he just zipped up his pants and

14  started driving.

15       Q.      Where did he drive to?

16       A.      Same place he got me.  When we got there he

17  just pushed me out of the car.

18       Q.      What did he say to you during the ride from

19  Beer Can Alley up to where he pushed you out of the

20  car?

21       A.      He kept telling me that I was nice and he

22  wanted to see me again.

23       Q.      Did he say anything else?

24       A.      No.

1    Q.    And, as he pushed you out did he say

2    anything to you?

3    A.    I don't remember.

4    Q.    What happened after he pushed you out of

5    the car?

6    A.    I just waited for the bus and I went to

7    Kennedy King.

8    Q.    What happened when you got to Kennedy King?

9    A.    I told my best friend and she went and told

10   one of the teachers that was with us.

11   Q.    What happened then?

12   A.    And then one of the school security guards

13   came and got me and took me down to his office and I

14   waited there until the police got there.

15   Q.    Did the police come?

16   A.    Yes.

17   Q.    And did you tell them what happened?

18   A.    Yes.

19   Q.    Did he they take you some where?

20   A.    To the hospital.

21   Q.    At the hospital were you examined for being

22   raped?

23   A.    Yes.

24   Q.    Back when he was abducting and assaulting

K28

1    you did you notice what he was wearing on the top of

2    his body?

3        A.    I remember that he was wearing a black

4    satin jacket with Ted written on it.

5        Q.    I want to direct your attention now to

6    about two weeks later after this attack on March 9th,

7    1989, at about three o'clock in the afternoon.  Did

8    the police have you look at a lineup?

9        A.    Yes.

10       Q.    And when you looked at the lineup did you

11   identify the defendant?

12       A.    Yes.

13       Q.    And, did you later find out that on

14   February the 2nd of 1990 that the defendant pleaded

15   guilty to the -- to raping you and that he got ten

16   years in prison under Case Number 89 CR dash 6784

17   slash 01?

18       A.    Yes.

19       Q.    Mr. Gaeta, at the time the defendant

20   abducted you off the street had you ever seen him

21   before?

22       A.    No.

23       Q.    And also, Miss Gaeta, would you tell us

24   what impact and effect did this assault have on you

1    after the defendant assaulted you?

2        A.    I was just really scared to go out.    I

3    wouldn't go outside.    I didn't want to go to school.

4        Q.    And how long did that last where you didn't

5    want to go to school and you didn't want to go

6    outside?

7        A.    It was a long time.

8        Q.    When you say a long time are you talking

9    days, weeks, months?   Would you give us an idea?

10        A.    · It was until school ended in June.   After

11    that I just stayed in during the whole summer.

12        Q.    And, what about the math club competition,

13    did you continue with that after this happened?

14        A.    Yes, but my father would drive me.

15        Q.    And, what the defendant did to you, did it

16    have any effect on your ability to sleep?

17        A.    Yes.

18        Q.    What effect did it have?

19        A.    I would wake up in the middle of the night

20    crying and I would have nightmares.

21        Q.    How long did the crying, waking up, and

22    crying and the nightmares last?

23        A.    About a year.

24        Q.    And, did it -- what the defendant did to

1    you affect your ability to function in any other ways?

2        A.    Well, I lost a lot of friends.  I didn't

3    want to talk to anybody.

4        Q.    And how would you say what he did to you

5    affected you emotionally?

6        A.    I don't know.  I was really scared for a

7    long time.

8        Q.    Have there been any long term effects from

9    what the defendant did to you?  Are there any effects

10   to this day that you still have?

11       A.    No.  I thought I had gotten over it.

12       Q.    I'm sorry?

13       A.    I thought I had gotten over it until I got

14   this call to come here.

15       MR. KELECIUS:  I have no further questions.  Mr.

16       THE COURT:  Mr. Luzcak, if you wish you may

17   inquire.

18

19                   CROSS-EXAMINATION

20                        BY

21                DEFENDANT LUZCAK:

22

23       Q.    Good morning, Miss Gaeta.  I would like to

24   take you back to 1986.  It's been 8 years almost 9,

K31

1    correct?  State's attorney asked you in the beginning

2    of his conversation if you remember what kind of car

3    it was; am I correct, and you told him that you didn't

4    remember it; correct?

5         A.    Yes.

6         Q.    And then he asked you again and you said it

7    was a white car, correct?

8         A.    Yes.

9         Q.    Did the State tell you to say it was a

10    white car or did you remember that it was a white car?

11        A.    I said it could have been a white car.

12        Q.    Did you remember that?

13        A.    Yes, yes.  I remembered.

14        Q.    Okay.

15              I will bring up a couple of names to

16    you.  Do you know a girl by the name of Maria Choa?

17        A.    No.

18        Q.    Linda Luzcak?

19        A.    No.

20        Q.    Nicole De La Paz?

21        A.    No.

22        Q.    You know none of them?

23        A.    No.

24        Q.    They never went to your school?

1    A.    They might have but I don't know them.

2    Q.    You never had a conversation with Nicole De

3  La Paz and Maria Choa a couple of days after that

4  saying that, yeah, we got him and we tricked him for

5  your boyfriend who was a GD that also went to the

6  school?

7    A.    You're so full of shit.  I didn't have a

8  boyfriend at the time, okay?  I don't know who you are

9  bringing up.  I don't know any of those women.

10    Q.    Did you ever have a conversation?

11    A.    No, I didn't.

12    Q.    Never during the time you went to school?

13    A.    No.

14    THE COURT:  Ask another question, sir.

15    DEFENDANT LUZCAK:    Yes, sir.

16    Q.    Isn't it a fact on that day that the

17  defendant never pulled you in the car, correct?

18    THE WITNESS:  A.    Yes, you did.

19    Q.    You were standing at a bus stop, correct?

20    A.    I was headed for the bus stop, correct.

21    Q.    You were standing at the bus stop by Bowen

22  High School?

23    A.    I was headed for the bus stop.

24    Q.    The bus stop is on South Chicago Avenue

1   around 92nd?

2        A.     Yes.

3        Q.     Trumbull Park?

4        A.     Bessmer.

5        Q.     It was Bessmer that you you were standing

6   at the bus stop when the defendant pulled up to you?

7        A.     I said no.

8        Q.     When the defendant pulled up to you, you

9   had a conversation and never pulled you in the car;

10  correct?

11       A.     No.

12       Q.     Never pulled you in the car?

13       A.     Yes.  He pulled me in the car.

14       Q.     Miss Gaeta, can you please tell me how that

15  is that you can't remember the color of a car but when

16  they get into a finer detail of the case you can

17  remember the whole thing?

18       MR. BROGAN:     Objection to that form of that

19  objection.

20       THE COURT:  I will sustain it.  Rephrase your

21  question.

22       DEFENDANT LUZCAK:  Q. Miss Gaeta, can you please

23  tell me how that you can remember certain parts of my

24  questions, part of the questioning they were asking

1    you and you couldn't remember other parts of the

2    questioning they were asking you?

3         MR. BROGAN:  Objection again.

4         THE COURT:  Do you understand that question?

5         THE WITNESS:  How can I forget what you did to

6    me?  I can't forget the details.  I can forget but not

7    exactly what you did to me, okay.

8         DEFENDANT LUZCAK:    I think you pretty much

9    explained that.  What I am saying is how is it that

10   you can remember some of the parts of it but you can't

11   remember other parts?

12        MR. BROGAN:  Objection.

13        DEFENDANT LUZCAK:    Because it's been eight years

14   exactly.

15        THE WITNESS:    Okay.

16             I remember exactly what you did to me.

17   That's not very easy to forget.

18        DEFENDANT LUZCAK:  I understand what you're

19   saying.  That's why I am trying to ask you a question.

20   How could it be that you couldn't remember certain

21   parts of finer details and other parts of finer

22   details you can't remember, which you should be able

23   to?

24        MR. KELECIUS:  Objection.

1        THE COURT:  Sustained.

2        MR. KELECIUS:  It's asked and answered.

3        THE COURT:  Sustained.

4        DEFENDANT LUZCAK:  Q.    You say you were pulled

5   into the car on this day, correct?

6        THE WITNESS:  A.    Yes.

7        Q.    Did you get a clear view of the car?

8        A.    Not clear, no.

9        Q.    How far away from the car were you when you

10  were pulled into the car?

11       A.    About a foot.

12       Q.    About a foot.  Can you remember if it was a

13  two door or four door?

14       A.    Nope.

15       Q.    Can you remember if it had license plates

16  on it?

17       A.    No.

18       Q.    Can you remember if there was only one or

19  two people in the car?

20       A.    There was only one.

21       Q.    Are you familiar with cars Cadillac, Ford,

22  Chevy, are you familiar?

23       A.    Yes.

24       Q.    Can you tell me what make of car it was?

1      A.     No.

2      Q.     Let me take you back to what I asked you

3   about these three women.  Now you say you were a

4   freshman at Bowen High School, correct?

5      A.     Sophomore.

6      Q.     Sophomore.  And in none of your classes you

7   had a girl named Nicole De La Paz?

8      A.     No.

9      Q.     Never had a girl named Maria Choa?

10      A.     No.

11      Q.     You have no recollection of them names?

12      A.     No.

13      Q.     Isn't it true, Miss Gaeta, that you either

14   are or were a former SGD Latin gang member?

15      A.     No.

16      Q.     Never?

17      A.     No.

18      Q.     Never hung with them?

19      A.     No.

20      Q.     You never stated to Maria Choa that we have

21   got Ted now?

22      A.     No, no, no.

23      Q.     You and Nicole?

24      A.     No.

1          THE COURT:  Counselor, that -- I will address you

2     as counselor because of the manner in which you

3     conduct yourself.  You do not repeat what the witness

4     has already answered.  Kindly proceed.

5          DEFENDANT LUZCAK:  Q.  Thank you.  Miss Choa, you

6     never had a conversation with Linda Luzcak?

7          THE WITNESS:  A.     No.

8          DEFENDANT LUZCAK:  I have nothing further.

9          THE COURT:  Do you have any additional questions?

10         MR. KELECIUS:  No.

11         THE COURT:  Thank you.  You may step down.  You

12    may call your next witness than aggravation.

13         MR. BROGAN:  While my partner is getting the next

14    witness at this time we will be introducing as

15    People's Exhibit Number One for purposes of the

16    sentencing a certified statement, statement of

17    conviction bearing certification of Aurelia Puccinski,

18    submit as a self-authenticating document.

19              It is a certified statement of

20    conviction in the case of People of the State of

21    Illinois versus Theodore Luzcak under Case Number 89

22    CR dash 6784 slash 01, and this particular certified

23    statement of conviction indicates on February 2nd,

24    1990, the defendant was sentenced to six years

1    Illinois Department of Corrections in that particular

2    case, and the charge being criminal sexual assault,

3    and two counts of criminal sexual assault.  We would

4    ask that that be had admitted into evidence during the

5    sentencing hearing.

6        THE COURT:  Show it to the defendant.

7                   It shall be allowed for the purpose of

8    aggravation.

9        MR. KELECIUS:   Our next witness is Miss Paula

10   Sledge.

11       THE COURT:  Will you, please, raise your right

12   hand?

13       (witness sworn.)

14       THE COURT:   Please inquire.

15

16             P A U L A   S L E D G E,

17   the witness herein, called as a witness on behalf of

18   the People of the State of Illinois, having been first

19   duly sworn, was examined and testified as follows:

20

21                 DIRECT EXAMINATION

22                 BY

23                 MR. KELECIUS:

24

1    Q.    Miss Sledge, would you tell us your full

2    name including your maiden name and your current

3    married name and if you could spell your name for the

4    record?

5    A.    Paula Sledge, S-l-e-d-g-e.  Coleman,

6    C-o-l-e-m-a-n.

7    Q.    Miss Coleman, I want to direct your

8    attention to March the 8th of 1989.  On March the 8th

9    of 1989 at about three o'clock in the afternoon, were

10   you walking in the area of 104th and Torrence in

11   Chicago, Illinois?

12   A.    Yes.

13   Q.    And, how old were you back on March 8th,

14   1989, as you were walking that area, 104th and

15   Torrence?

16   A.    14 years.  14 years old.

17   Q.    How far away were you from your birthday at

18   that time?

19   A.    Four days.

20   Q.    And in four days you were to turn 15?

21   A.    Yes.

22   Q.    And as you were walking at that location

23   where were you heading?

24   A.    To get something to eat.

1    Q.    And back then were you enrolled in school?

2    A.    Yes.

3    Q.    What school were you enrolled in?

4    A.    Elizabeth Seaton Academy.

5    Q.    In what year school were you in at that

6    time?

7    A.    Freshman going into my second year.

8    Q.    And as you were walking to get something to

9    eat at that particular time did something happen?

10    A.    Yes.

11    Q.    What happened?

12    A.    I was stopped at the corner.  I was going

13    to cross the street and a car pulled up, and in that

14    car there was a guy by the name of Theodore Luzcak who

15    had asked me where was I going.  I said to get

16    something to eat.

17    Q.    Let me stop you right here.  Had you ever

18    seen Theodore Luzcak prior to this?

19    A.    Yes, I had.

20    Q.    Tell us how many times had you seen him

21    prior to this?

22    A.    Once.

23    Q.    About how long ago was that prior to this?

24    A.    In January of that year I would say about

1    two months ago -- two months previously.

2         Q.    Do you see Theodore Luzcak in court?

3         A.    Yes.

4         Q.    Point to Theodore Luzcak and out tell us

5    what he is wearing today.

6         A.    It's him right there.  He's wearing I guess

7    tan pants, long sleeve shirt.

8         MR. KELECIUS:  Judge, may the --

9         THE WITNESS:  A.    Black shirt.

10        MR. KELECIUS:    She has identified the

11   defendant.

12        THE COURT:  It shall.

13        MR. KELECIUS:  Q.    How is it that you met him

14   for the first time.  Tell us how that happened.

15        THE WITNESS:  A.    I standing on the bus stop,

16   and he approached me and just made small conversation,

17   how are you doing, what's your name, things of that

18   nature.

19        Q.    How long did you and he converse at the bus

20   stop that month earlier?

21        A.    Maybe about four or five minutes.

22        Q.    Then how did that conversation end?

23        A.    The bus came and I got on the bus and left.

24        Q.    I want to come back again.  Now ON March

1    8th, 1989, when Mr. Luzcak pulled up again, what

2    happened when he pulled up in the car?

3        A.     He offered to take me to get something to

4    eat, and I got in the back seat.

5        Q.     Were there any other people in the car at

6    this time?

7        A.     Yeah.  There were two other people in the

8    car with him.

9        Q.     Were they men or women?

10       A.     Men.

11       Q.     What part of the car were those two men in?

12       A.     One is in the front seat, and one was in

13   the passenger seat, and one was in the back seat.

14       Q.     And so now after you got into the back seat

15   there were now two people in the front and two people

16   in the back?

17       A.     Um-humm, yes.

18       Q.     Where did the defendant say he was to going

19   to give you a ride to?

20       A.     Mac Donald on 95th and Jeffrey.

21       Q.     Did he begin driving at that time?

22       A.     No -- yeah.  He began driving towards 95th

23   and Jeffrey.

24       Q.     Where did he go first?

1    A.    He said he had to drop one of his friends

2    off.  They had to do something.

3    Q.    At this time did he drop one of the two men

4    with him off?

5    A.    Yeah.

6    Q.    Do you remember approximately where that

7    was?

8    A.    On maybe like 112th somewhere on the

9    southeast side, one of the avenues, Avenue O,

10   somewhere over there.

11   Q.    After he dropped off one of the two men

12   with him at that particular time how many people were

13   in the car?

14   A.    Just him me and the one in the back seat.

15   Q.    And now after he dropped off the man who

16   was in the front seat did anybody change positions?

17   A.    I got in the front seat.

18   Q.    And so after you got in the front seat

19   there were two in the front and one man in the back?

20   A.    Um-humm.

21   Q.    You have to answer yes or no.

22   A.    Yes, yes.

23   Q.    What's the next thing then that happened?

24   A.    He mentioned something that he wanted to

1    take his friend to buy some marijuana, and he took him

2    to buy the marijuana, and then somewhere along he

3    dropped him off, and then we went to -- it was some

4    place they called Wolf Lake or Beer Can Alley.

5        Q.    How did you end up at Wolf Lake or Beer Can

6    Alley if he was supposed to take you to Mc Donalds?

7        A.    I guess those were his intentions.  I don't

8    know.  I asked him where were we going, and he just

9    said I got to drop him off to do something.

10        Q.    After he dropped off that last man, the man

11    in the back seat, there were only the two of you in

12    the car?

13        A.    Right.

14        Q.    Did you say anything to him when you

15    started driving, now just the two of you?

16        A.    Yeah.  I said it was time for me to get

17    home, it was getting kind of late, and I really needed

18    to go home.  That's when he proceeded to go back down

19    I guess the Beer Can Alley like the winding road.

20        Q.    Did you ask him anything about Mc Donalds

21    at this time?

22        A.    Yeah.  At this point it kind of blew my

23    mind.  I had to go back home.  I wasn't really

24    concerned about getting anything to eat then.

1    Q.    So you didn't even bring up the subject?

2    A.    No.  I told him I wanted to go home.

3    Q.    Where did he take you?

4    A.    Down a winding road, Beer Can Alley.

5    Q.    And, how secluded is Beer Can Alley?

6    A.    It's -- it looks pretty scary over there

7    like a lake with a bunch of debris laying around, and

8    there's a lot of black gravel, winding road.  It's not

9    a real pleasant place to be.

10    Q.    What was the defendant saying to you as he

11    was driving you down those winding roads of Beer Can

12    Alley?

13    A.    Just really saying everything is going to

14    be all right.  I'll take you back home, things of that

15    nature to try and just smooth everything over.

16    Q.    So what happened?

17    A.    That's when we came to a stop and he asked

18    me was I a virgin.

19    Q.    What did you say?

20    A.    I told him yeah.  He asked me had I ever

21    performed oral sex before.  I'm like no.  And, he

22    asked me to give him some head then, and he he made me

23    give him oral sex.

24    Q.    What did you say to him?

1      A.     I told him no, and he grabbed me around my

2    neck, and he told me if I ever wanted to see my family

3    again I better do what he tell me to do.

4      Q.     Did you have family at this time?

5      A.     Yes.

6      Q.     What family did you have at this time?

7      A.     Three brothers and two sisters and a mother

8    and a father.

9      Q.     And when he had his hand on your throat and

10   said that to you, how did the hands feel on your

11   throat?

12      A.     It was real tight and rough.  He squeezed

13   it.

14      Q.     Did it affect your breathing ability to

15   breathe at all?

16      A.     I was able to breathe, but I started to cry

17   so I really became short of breath.

18      Q.     So what happened?

19      A.     He made me -- he pulled down his pants and

20   he made my perform oral sex.

21      Q.     And, when he made you perform oral sex

22   where did he place his penis?

23      A.     Inside of my mouth.

24      Q.     How long did he have it in your mouth?

1      A.     I don't know.  He was more or less pushing

2   my head up and down making me do it.

3      Q.     How was he holding on to your head?

4      A.     I had a pony tail.  He was holding it.

5      Q.     And how did that end?

6      A.     Then he asked me for anal sex and then he

7   kind of like flipped me to the passenger side.

8      Q.     When you say he asked asked you for anal

9   sex could you tell us what his words were?

10      A.     How have you ever been fucked in the ass

11   before.

12      Q.     What did you say?

13      A.     No.

14      Q.     What did he say then?

15      A.     Well, he said well -- something like I like

16   it.  And he said something since you are a virgin, it

17   should be real nice and tight something to that

18   nature.

19      Q.     What happened?

20      A.     He pulled down my pants and he performed

21   anal sex.

22      Q.     And when you say anal sex where did he

23   place his penis?

24      A.     Inside of my anus.

1    Q.    And, how long did he have his penis in your

2  anus?

3    A.    Maybe 3 to 4 minutes.

4    Q.    And was he still or was penis moving and

5  was he moving when he had his penis in your anus?

6    A.    It was moving and he was moving.

7    Q.    And, was he saying anything to you during

8  this time with his penis in your anus?

9    A.    No.

10   Q.    You have to answer out loud.

11   A.    No.  Not that I can remember.

12   Q.    Were you saying anything to him during this

13  time?

14   A.    Yes.  I was screaming because it hurted.

15   Q.    How much did it hurt?

16   A.    It hurt real bad.

17   Q.    And, how far into your anus did he put his

18  penis?

19   A.    I would imagine all the way.

20   Q.    And, how did this end?

21   A.    I guess he had an ejaculation, and you know

22  it was just like, okay, I'm done, and then he say you

23  need to hurry up and put your clothes on; and so by

24  that time I'm saying you know I'm getting -- I told

1     him I have to get home.

2              I'm getting real scared and don't drop

3     me off in front of my house because I'm going to get

4     in trouble with my mother and father.  He said so

5     you're not going to tell what happened.  I said I

6     could never tell anyone because I had been in so much

7     trouble with my parents, then he said I will pick you

8     up from school tomorrow.  Tell me what time you get

9     out, and I think I told him 1:30 or two o'clock or

10    something.  So he said he promised to pick me up from

11    school and that he made me promise to him that I would

12    never tell anybody.

13         Q.    And so where did he take you?

14         A.    Back to 104th and Torrence.

15         Q.    What happened when you got to 104th and

16    Torrence?

17         A.    I got out of the vehicle.

18         Q.    What happened then?

19         A.    I went in to use the pay phone and then I

20    walked home from there.

21         Q.    And, could you describe how you appeared at

22    this time?

23         A.    My hair was all over my head.  My clothes

24    were in disarray.  I was crying and I just kind of

1    stumbled across the street to a friend's house.

2        Q.    What happened?

3        A.    He called the police.

4        Q.    And did the police come?

5        A.    Yes.

6        Q.    And did you tell the police what happened?

7        A.    Yes.

8        Q.    Did the police take you some where?

9        A.    To South Chicago Hospital.

10        Q.    And at South Chicago Hospital were you

11    treated for being raped?

12        A.    Yes.  They did a series of tests and after

13    that the detectives came and they took me back to the

14    police station on 111th.

15        Q.    And did they interview you there?  Did you

16    tell them?

17        A.    They interviewed me and they had me to look

18    at mug shot books.

19        Q.    Now, I want to direct your attention to the

20    next day and the next date about three o'clock in the

21    afternoon.  Did they have you look at a lineup at the

22    police station?

23        A.    Yeah.

24        Q.    After you looked at lineup did you identify

K51

1    anybody?

2        A.    Yes, I did.

3        Q.    Who did you identify?

4        A.    Theodore Luzcak.

5        Q.    The same Theodore Luzcak that is in

6    courtroom today?

7        A.    Yes.

8        Q.    Miss Sledge-Coleman, did you later learn

9    that on February 2nd of 1990 the defendant pleaded

10    guilty and was sentenced to ten years in prison for

11    having raped you in Case Number 89 CR dash 6782 slash

12    1?

13        A.    Yes, I did.

14        Q.    Miss Sledge-Coleman, I would like to ask

15    you could you tell the Court what effect or impact

16    what Theodore Luzcak did to you had on you?

17        A.    It's been a very long term effect.  I have

18    had counseling.  Counseling hasn't seemed to help

19    anything, so I have learned to really deal with it and

20    repress my feelings down and keep them to myself.

21        Q.    How long did you go for counseling?

22        A.    A year.

23        Q.    In the beginning when it first happened did

24    it have any effect on your ability to sleep?

1      A.      There were many, many, many, many, many

2  nights that I did not sleep.  There were -- I lost a

3  lot of weight.  I didn't want to eat.  I have been

4  very antisocial.

5      Q.      Were there any effects on the kind of

6  dreams that you were having?

7      A.      I can't hear you.

8      Q.      Was there any effect on the kind of dreams?

9      A.      Nightmares, yes.  There was serious

10  nightmares.  There were many nights my mother and

11  father came in at night to comfort me.

12     Q.      About how long a time period did the

13  nightmares last?

14     A.      I still have nightmares to this day.

15     Q.      And, could you tell us did it affect your

16  ability to function in any ways?

17     A.      During my freshman year of high school my

18  grades dropped considerably after that.  I was an

19  honor role student.

20     Q.      Before this happened you were an honor role

21  student?

22     A.      Yes.

23     Q.      Afterwards?

24     A.      They dropped.

1     Q.     Did it affect your ability to function in

2   any other ways?

3     A.     Socially I was just really stayed in the

4   house by my mom and that was it.  I didn't want to be

5   around anyone, men in particular.

6     Q.     How would you say that it affected you

7   emotionally?

8     A.     My emotional state, I would sit and cry for

9   periods.  I would try not to think about it.  That

10   would be my best solution to it, but sometimes it's

11   just hard to bypass.

12     MR. BROGAN:    I have no further questions.

13     THE COURT:  Do you wish to inquire, Mr. Luzcak?

14

15                 CROSS-EXAMINATION

16                 BY

17                 DEFENDANT LUZCAK:

18

19     Q.     Good afternoon, Miss Sledge.  I would like

20   to also take you back to the 8th of March, 1989.

21     A.     Excuse me.  Do I have to answer anything

22   from him?

23     THE COURT:  He has a right to ask questions.

24     DEFENDANT LUZCAK:  Q.    Miss Sledge, you stated

( )                                    ( )

1    through the state's attorney that you were on 101st

2    and Torrence Avenue waiting for a bus?

3         THE WITNESS:   A.    No, I did not say 101st and

4    Torrence Avenue.

5         Q.    Was it one hundred?

6         A.    104th, and I was not waiting for a bus

7    there.   I was going to get something to eat there.

8         Q.    And when the car allegedly pulled up where

9    were you exactly?

10        A.    I was getting ready to cross the street.

11        Q.    Going to?

12        A.    Across the street.

13        Q.    East, westbound?

14        A.    Westbound.

15        Q.    Westbound?

16        A.    Eastbound rather.   I'm sorry.   East.

17        Q.    Toward the lake?

18        A.    There was no lake over there, not on

19   Torrence.   There's no lake on Torrence.

20        Q.    What I am saying you were going eastbound

21   towards the lake?

22        A.    East, right.

23        Q.    Thank you.   And, you said you observed a

24   car with one passenger or three passengers?

K55

1      A.     Yeah.

2      Q.     Can you tell the Ladies and Gentlemen --

3      can you tell the Court what you were wearing on that

4      date?

5      A.     I was wearing a Seaton jogging suit.

6      Q.     Seaton jogging suit?

7      A.     With a black leather coat.

8      Q.     And you stated to the state's attorney that

9      you had an encounter with defendant before this

10     previously?

11     A.     Yes.

12     Q.     And you knew him as Theodore Luzcak at that

13     time?

14     A.     No, I did not, Jeffrey Schwabner.  You were

15     in your girlfriend's white Z-24.

16     Q.     You told the police this?

17     A.     Before, yes, I did.

18     Q.     I was in a -- strike that.  I'm sorry.  The

19     defendant was in the same car?

20     A.     No.  You were in a rental car, a white Ford

21     Taurus, maroon interior.

22     Q.     On which day?

23     A.     March 8th, 1989.

24     Q.     The day of the occurrence?

1     A.    Yes.

2     Q.    And on the previous time the defendant was

3 in what kind?

4     A.    A white Z-24.  Shouldn't you remember this?

5     Q.    And, who told -- who told you the name

6 Jeffrey Schwab?

7     A.    You did.

8     Q.    And then on the March date I told you my

9 real name?

10    A.    You gave some bogus name as usual.  Then

11 you said you had just been released from the Cook

12 County jail two weeks prior.

13    Q.    How did you get Theodore Luzcak?

14    A.    You mean how did the police get Theodore

15 Luzcak?  Remember.  Your friends.

16    Q.    How did you?

17    A.    I got your correct name from the officers.

18    Q.    The police?

19    A.    Yes.

20    Q.    Didn't you state that --

21    A.    Also went by Ted.

22    Q.    Strike that.

23            What kind of clothing was it the

24 defendant was wearing on this date?

1       A.      I really don't remember.

2       Q.      Was he wearing a black jacket with the name

3    Ted on there?

4       A.      I can't really remember.  From my

5    understanding when you were arrested you had on a

6    black jacket with Ted on there.

7       Q.      The police told you this, correct?

8       A.      I'm not sure.  From my understanding when

9    you were arrested that's what you were wearing.

10      Q.      Can you tell me where you gathered the

11   information from the defendant was wearing a black

12   jacket with Ted on it?

13      A.      No, I can't.

14      Q.      You remember who told you that?

15      A.      Yeah.

16      Q.      But you remember hearing that?

17      A.      Yeah.

18   DEFENDANT LUZCAK:  No further questions.

19   MR. KELECIUS:  We have no questions.

20   THE COURT:  Mr. State's Attorney, it's my

21   understanding you do not have any additional live

22   witnesses today.

23   MR. KELECIUS:  No.  Same as with the last case I

24   do at this time offer as People's Exhibit Number Two

1  for purposes of sentencing the certified statement of

2  conviction and that will be certified statement of

3  conviction in Case Number 89 CR dash of 782 slash 01

4  as a certified statement of conviction certified by

5  Aurelia Puccinski, Clerk of the Circuit Court of Cook

6  County, and indicating that on February the 2nd of

7  1990, in the case of People of the State of Illinois

8  versus Theodore Luzcak the defendant was sentenced to

9  ten years in the Illinois Department of Corrections on

10 two counts of aggravated criminal sexual assault:  I'm

11 showing this certified statement of conviction to Mr.

12 Luzcak.

13      THE COURT:  So admitted, State.

14      MR. KELECIUS:  I do offer this into evidence.

15      THE COURT:  It shall be allowed in aggravation,

16 marked for identification, stricken.

17      MR. KELECIUS:  Those are all the witnesses People

18 have.  We are expecting a few others witnesses on

19 Friday.  I do believe Mr. Luzcak has some defense

20 witnesses we might be able to take out of order.

21      THE COURT:  In any event do you understand your

22 next date will be July 25?

23      DEFENDANT LUZCAK:     Yes, sir.

24      THE COURT:  At the time you may present

NICOLE RENEE DE LAPAZ,

called as a witness on behalf of the people of the

state of Illinois, having been first duly sworn, was

examined and testified as follows:


DIRECT EXAMINATION

BY

MR. BROGAN:


Q    Miss, would you please tell us your name?

A    Nicole Renee De Lapaz.

Q    How did you spell your last name?

A    D like in David, E-L-A-P-A-Z.

Q    How old are you, Ms. De Lapaz?

A    25.

Q    In February of 1989 were you attending

schooling?

A    Where was I attending school?

Q    Were you attending school?

A    Yes.  I was in high school.

Q    What high school did you go to?

A    George Washington High School.

Q    What area is George Washington High School?

A    It's on the south side of Chicago, 112th I

1    believe, on the east side.

2        Q    I'm going to call your attention to February

3    14 of 1989 at about 8:00 o'clock in the morning, would

4    you tell us where you were and what you were doing?

5        A    I was on Commercial Avenue going to get the

6    bus to go to school.

7        Q    Were you able to catch that bus?

8        A    No, I was running late.

9        Q    Tell us what happened at that time?

10       A.   I seen Theodore Luczak and he asked me if I

11   needed a ride.

12       Q    The person you refer to as Theodore Luczak,

13   do you see that person in court today?

14       A    Yes.  He is sitting over there.

15       Q    Please point to him and describe an article

16   of clothing that he is wearing?

17       A    I can't really see the colors.

18       Q    Is it the man sitting by himself at the

19   table?

20       A    Yes, sitting by himself at the left side.

21       MR. BROGAN:  Your Honor, may the record reflect

22   the witness identified this defendant in open court.

23       THE COURT:  It may.

24

1    BY MR. BROGAN:

2        Q    When he asked you if you needed a ride was he

3    in a car?

4        A    Yes, a white car.  I don't know what kind,

5    small.

6        Q    Was anyone else in the car with him?

7        A    No.  He was alone.

8        Q    Did you agree to accept a ride from him?

9        A    Yes.  I knew him.

10        Q    Where was he going to take you to?

11        A    To school.

12        Q    Did he take you right to school?

13        A    Not right to school.

14        Q    Tell us what happened when you got in the

15    car?

16        A    He started talking about gangs and making

17    threats and saying that I knew things about gangs that

18    I shouldn't have known and he had to violate me.

19        Q    Was there a particular gang that he was

20    talking about?

21        A    Latin Kings.

22        Q    Did he mention anything about his

23    relationship to the Latin Kings at that time?

24        A    Yes.  That he was a Latin King and he did

1    have some rank and say so in the gang.

2        Q    You told us something about violating you.

3    Explain again what defendant said?

4        A    At first I really didn't understand what he

5    meant.  I was shocked I guess.  He basically meant to

6    cause physical harm to me in some way.

7        Q    The term violation, what does that term mean?

8        A    He physically assaulted me.

9        Q    Now, after he told you you would be -- he

10   told you you would be violated by the Latin Kings, is

11   that correct?

12       A    By him.

13       Q    Tell us why -- were you still in the car at

14   that point?

15       A    Yes, the whole time.

16       Q    Tell us where the car went?

17       A    He went down Indianapolis towards an -- a

18   secluded alley, a part of Calumet Park.

19       Q    Does that adjoin or abut any type of

20   landmark?

21       A    It's connected with the beach.

22       Q    Is water there?

23       A    Yes.  There is water there.

24       Q    Did the defendant make any other threat to

1    you?

2         A    He told me that he would kill me if I didn't

3    cooperate and if I told anybody about what happened.

4         Q    And how did he say that he would kill you?

5         A    He said that he would throw me in the lake

6    and drown me.

7         Q    When you got to that location would you tell

8    us if the defendant did anything else or said anything

9    else?

10        A    He called me a tease and --

11        THE COURT:  Please keep your voice up.

12        THE WITNESS:  He told me that I was a tease and

13   that he had to violate me.

14   BY MR. BROGAN:

15        Q    Tell us what happened then?

16        A    He somehow managed to get my seat to go back

17   and he got on top of me.

18        Q    When he got on top of you what did he do?

19        A    He tried to put his penis in my mouth.

20        Q    Was he able to do that?

21        A    No, he was not.

22        Q    Why is that?

23        A    Because I was fighting him off.

24        Q    Tell us what happened then?

1    A    He put his penis inside of my vagina.

2    Q    What happened after that?

3    A    Then he put his penis in my anus.

4    Q    After that happened, Ms. De Lapaz, tell us

5    the next thing that took place?

6    A    He kept threatening me, just telling me I

7    better not tell anybody else he would kill me.

8    Q    From that location where did you then go?

9    A    He took me to school from there.

10    Q    And when you got to the area by school what

11    happened then?

12    A    He told me not to tell anybody, not to tell

13    the cops or anybody and that he would be waiting for

14    me after school.

15    Q    The area that you described as Beer Can

16    Alley, what part of the city of Chicago is that?

17    A    It's still Illinois, south side.

18    Q    That would be the southeast side?

19    A    Uh-huh.

20    MR. BROGAN:  I have no further questions.

21    THE COURT:  You may inquire.

22

23

24

1             CROSS EXAMINATION

2                    BY

3             BY MR. LUCZAK:

4

5    Q    Good afternoon, Ms. De Lapaz?

6    A    Good afternoon.

7    Q    Ms. De Lapaz, I want to direct your attention

8    to February 14, 1989, at 9:00 o'clock in the morning.

9    Can you tell me anything that happened?

10   A    It was earlier than 9:00 o'clock in the

11   morning.  I was running late for school.

12   Q    What time was it?

13   A    Around 8.

14   Q    You then met the defendant?

15   A    Yes, I met you on commercial.

16   Q    Ms. Sagan, were you -- strike that.  Ms. De

17   Lapaz, were you ever in a gang?

18   A'   No, sir.  I hung around with different

19   members from different gangs, I got along with

20   everybody.

21   Q    You never had pitchforks on your chest?

22   A    No, sir.

23   Q    Did you know a lot of the gang members in the

24   South Chicago area?

1        A      Yes.

2        Q      Kings?

3        A      I lived around all kings and I went to school

4    with a variety of members from different gangs.

5        Q      Is anybody in your family a former gang?

6        MR. BROGAN:  Objection as to relevance of this,

7    Judge.

8        THE COURT:  I will sustain the objection.

9        THE WITNESS:  To my knowledge, no --

10       THE COURT:  You don't have to answer that.

11   BY MR. LUCZAK:

12       Q      Were you with anybody on this day, Ms.

13   Sagan -- strike that.  My fault.  Ms. De Lapaz?

14       A      No.

15       Q      You were by yourself?

16       A      Uh-huh.

17       Q      On this day did you have occasion to talk to

18   a Ms. Maria Johnson?

19       A      No, it was too early in the morning, I was

20   going to school.

21       Q      Did you have occasion to talk to Marie

22   Johnson before that day?

23       A      Yes, we were friends.

24       Q      Did you ever tell Marie Johnson that you had

1      a crush on the defendant?

2           A      No.

3           Q      You never told her that?

4           A      Never.

5           Q      How do you know Ms. Johnson?

6           A      How do I know her, from family and the

7      neighborhood.

8           Q      Do you know if she's associated with a gang?

9           A      Not to my knowledge, no.

10          Q      So you say on this day you were going to

11     school.  Can you tell me where you met the defendant?

12          A      I don't remember the exact location, I know

13     it was on Commercial, because that's the path I take

14     to go to school.  It's eight years ago.  I don't

15     remember everything.

16          Q      You have stated that the defendant told you

17     that he had to violate you?

18          A      Yes.

19          Q      Did he tell you why?

20          A      All I remember him saying was I knew too much

21     information about the Kings, but I didn't even know

22     what information he was talking about.

23          Q      Did he name a certain location where the

24     kings were from that you knew information about?

1      A      Not that I recall, no.

2      Q      You never stated to the police that it was

3   from the Latin Kings on the north side?

4      A      No, I really don't think I would have said

5   that.  I don't remember but I seriously doubt it, I

6   never went to the north side.

7      Q      Why do you think the defendant would tell you

8   he had to violate you, Ms. De Lapaz?

9      A      I really don't know, maybe because I lived in

10  the neighborhood.  It was all Kings and a lot of them

11  didn't like me.

12     Q      Maybe because you were in the opposite gang?

13     A      No, because I talked to people from different

14  gangs.

15     Q      Such as?

16     A      Such as Counts, Folks, Vice Lords, whoever.

17     Q      So you are --

18     A      As friends at school.  That's how I knew

19  everybody.

20     Q      So you're saying the Kings were mad at you?

21     A      The Kings didn't like the fact that someone

22  in their neighborhood talked to other people.

23     Q      How long did you know the defendant before

24  this incident?

1      A    I don't remember.  It wasn't long.  Maybe a

2    few months.

3      Q    You never told the police you knew the

4    defendant for over a year before this incident?

5      A    I don't remember, sir.  It was over eight

6    years ago.  I can't remember everything I told them

7    back then but whatever I told them was the truth.

8      Q    Do you remember telling the police that you

9    and defendant went out on a couple of dates before?

10    You never told police that?

11      A    No.  I told them I had received a ride from

12    him once before and at that time I was with my cousin.

13      Q    Who is your cousin?

14      A    Paul -- I can't remember his last name.  I

15    don't recall his last name right now.  He has a

16    different last name, he is a relative.

17      Q    So you had been with the defendant before

18    this occasion, right?

19      A    I had been with defendant with Marie Johnson

20    and with my cousin.

21      Q    On how many occasions would you say?

22      A    Two that I remember before the rape.

23      Q    Now, this alleged rape took place on February

24    14, 1989?

1          A     Yes.

2          Q     Can you tell me the date that you reported it

3     to the hospital?

4          A     It was around two weeks later.

5          Q     Can you tell the ladies and gentlemen of the

6     jury why it took you two weeks?

7          A     Because I was afraid of the gangs and you and

8     for my life and the only reason I told was because I

9     got sick and ended up in the hospital due to the rape.

10         Q     So it was a period of 14 days, 16 days?

11         A     14 to 16 days, that's correct.

12         Q     And nobody else did anything to you within

13    that 16 days?

14         A     No.

15         Q     Ms. De Lapaz, isn't it true that your own

16    gang violated you too?

17         A     I'm not in a gang.

18         Q     Ms. De Lapaz you never were an SGD Latin?

19         A     Never.  I hung around them, I never was.

20         Q     You never put pitchforks on your chest?

21         A     No.

22         Q     You never showed the defendant pitchforks on

23    your chest?

24         A     I don't have a pitch fork on my chest, I have

1    a heart on my chest.

2        Q    What does the heart represent?

3        A    It's just a heart, just a design.

4        Q    It doesn't represent a gang?

5        A    No, sir.

6        Q    Doesn't represent GD?

7        A    No.

8        Q    GD as far as cousin of the is LD's?

9        A    Nothing with gangs.

10       MR. LUCZAK:  Your Honor, I ask at this time to

11   question her later.

12       THE COURT:  Side bar.

13                        (The following proceedings were had

14                        outside of the presence and hearing

15                        of the jury:)

16       THE COURT:  We're in chambers.  Defendant and all

17   counsel are present.

18           What did you want to know?

19       MR. LUCZAK:  For one I have a witness as to her

20   gang affiliation that I have found and I will tender

21   that over to the state.

22       THE COURT:  Mr. State's Attorney.

23       MR. BROGAN:  What are you tendering me?

24       MR. LUCZAK:  That's what I said.

1    THE COURT:  What is it you have?

2    MR. LUCZAK:  I have a witness on the street that

3    can testify that she was in a gang, a reliable

4    witness.  Also I have photographs.

5    THE COURT:  Were you convicted of this offense

6    involving this woman?

7    MR. LUCZAK:  Yes, I was.

8    THE COURT:  Okay.  What else is involved here.  If

9    you put this on you may be opening the door to

10   introduce you were convicted of this offense.

11   MR. LUCZAK:  They already know I was convicted of

12   this offense.

13   THE COURT:  No they do not, sir.  I scrupulously

14   kept that out.  I'm trying to admonish you.

15   MR. LUCZAK:  I have no further questions.  I

16   thought you were going to introduce I was convicted of

17   this crime.

18   THE COURT:  No.  If you keep pursuing this they

19   can rehabilitate and very likely demonstrate.

20   MR. LUCZAK:  Then I have no further questions.

21   THE COURT:  Off the record.

22                          (WHEREUPON, a discussion was

23                          had off the record.)

24   MR. LUCZAK:  I have no further questions.

1      THE COURT:  Mr. Brogan, redirect if any.

2

3                     REDIRECT EXAMINATION

4                     BY

5                     MR. BROGAN:

6

7      Q    You have never dated this man, is that

8  correct?

9      A    Never.

10     Q    And you never told the police that you dated

11 this man, is that correct?

12     A    Never did.

13     MR. BROGAN:  No further questions.

14     THE COURT:  Recross?

15     MR. LUCZAK:  No recross, your Honor.

16     THE COURT:  You may step down, madam.

17     THE COURT:  We have one more witness.

18                          (Witness sworn)

19     THE COURT:  You may inquire.

20

21

22

23

24

1    that you are dangerous. You do prey and have preyed

2    upon the naive, the youthful, the helpless. And you do

3    propose a threat to society.

4         Accordingly, Mr. Luczak, for the offense of

5    aggravated criminal sexual assault to Sheri Sagan, the

6    offense of contact between penis and anus, which you

7    stand convicted, you are sentenced to an extended term

8    in the Illinois Department Of Corrections,  the

9    penitentiary, for a term of 60 years. For the offense

10    of aggravated criminal sexual assault with Sheri

11    Sagan, between penis and mouth, which you stand

12    convicted, you are sentenced to 40 years, to be served

13    consecutively to the 60 year sentence I imposed upon

14    you.

15         You have, as you know, an absolute right to

16    appeal. I know are you indigent.  A free transcript

17    will be given to you of the common-law record.

18    I will appoint counsel to represent you. That' will be

19    the Public Defender of Cook County or the State

20    Appellate Defender.

21         I will admonish you, you must file a notice

22    of appeal within 30 days from today, which is,

23    for the record, June 27, 1997. If you like, I would

24    like the Public Defender who is appointed you, Miss

N-38

_____ County)   (Municipal)   DEPARTMENT   Criminal   (Division)   (Dist.)

People of the State of Illinois

v.   NO. 95CR 14118-01

Theodore Luczak   I. R. # 723379

Defendant   S. L. D. # _____

## ORDER OF SENTENCE AND COMMITMENT TO
## ILLINOIS DEPARTMENT OF CORRECTIONS

The defendant having been adjudged guilty of committing the offense(s) enumerated below,

IT IS ORDERED that the defendant _____ Theodore Luczak _____ be and is here

_____ced to the ILLINOIS DEPARTMENT OF CORRECTIONS AS FOLLOWS:

On June 27, 1997 The Honorable Judge Edward M. Fiala Jr. sentenced the Deft to Sixty (60) Years for the offense of Agg. Crim. Sex Assault and Forty (COUNT 2) years for the offense of Agg. Crim. Sex Assault. (COUNT 5) Judgment entered Sentence on Ct 5 to run consecutive to Ct 2 Credit Deft for time served in Custody. R. Mitt to Issue.

| #2 | Agg. Crim. Sex Assault | 720 | ILCS | 5 | 112-14(A)(3) |
| #5 | Agg. Crim. Sex Assault | 720 | ILCS | 5 | 112-14(A)(2) |
| _____ | _____ | _____ | ILCS | / | _____ |
| _____ | _____ | _____ | ILCS | / | _____ |

(Statutory Citation)

IT IS FURTHER ORDERED that the Clerk of the Court shall deliver a copy of this order to the Sheriff of Cook County

IT IS FURTHER ORDERED that the Sheriff of Cook County shall take the defendant into custody and deliver him/her to th _____nois Department of Corrections.

IT IS FURTHER ORDERED that the Illinois Department of Corrections shall take the defendant into custody and confine him _____ in the manner provided by law until the above sentence is fulfilled.

PREPARED BY _____ R. Alvarado

DEPUTY CLERK

BRANCH COURT 600   DATE 6/27/97

Room

ENTER: _____

JUDGE   JUDGE'S NO.

C295

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILE RECORD - COURT CLERK WILL ATTACH TO FILE

Original State Habeas Petition

Appendix # A

# Appendix

#A – Original State Habeas Petition

#B – Denial of Petition in Circuit Court

# C – Notice of Appeal

#D – Extension of Time To File Record

# E – Letter Requesting Clerk to File Record

# F – Order of Appellate Court Dismissing Appelal

# G – Writ to Illinois Supreme Court

# H – Illinois Supreme Court Denial of Writ

# I – Petition for Leave to Appeal for DNA Evidence.

IN THE
CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT--CRIMINAL DIVISION

Theodore Luczak

**Petitioner,**

.v.

Guy D. Pierce

**Respondent,**

## HABEAS CORPUS PETITION

Theodore Luczak **Pro-Se;**
Reg No:#B-00780
Pontiac Correctional Center
700 W. Lincoln St./P.O. Box 99
Pontiac, Illinois 61764

Cover Page

IN THE
## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT--CRIMINAL DIVISION

| | |
|---|---|
| Theodore Luczak | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| | ) |
| | ) |
| .vs. | ) Case No: **89-CR-06782** |
| | ) **89-CR-06783** |
| | ) **89-CR-06784** |
| | ) |
| Guy D. Pierce | ) Honorable |
| | ) **JOHN J. MANNION** |
| **Respondent,** | ) Judge Presiding |

## HABEAS CORPUS PETITION

To: Circuit Court of Cook County, Illinois.

The petition of, Theodore Luczak, for **Habeas Corpus** pursuant to **735 ILCS §§5/10-102; 5/2-1401.**

**[1]**        I, Theodore Luczak, **pro-se;** in whose behalf the petition is applied for, is confined or restrained of liberty at the Pontiac Correctional Center. Pontiac, Illinois 61764, Livingston County, by Warden Guy D. Pierce, respondent above named, Chief Administrative Officer of said correctional center.

**[2]**        Name and location of court under whose process pet-

-1-

itioner is confine( ) District Six(6) 16501 S. Ke_zie Parkway.
Markham, Illinois 60426.


[3]        Name of the crime and case number resulting in con-
finement: Aggervated Criminal Sexual Assault. 89-CR-06782; 89--
CR-06783 and 89-CR-0674.


[4]        The length of sentence is Ten(10) years, and a copy
of the commitment is not attached hereto as the clerks office will
not provide the petitioner a copy of such.


[5]        The date of judgement is February 02, 1990.


[6]        I entered a plea of guilty.


[7]        An appeal was not taken.


[8]        An appeal was not taken due to the ineffictive assi-
stance of counsel.


[9]        No other application, petition, or motion has been
filed or made in regard to the same detention or restraint.


[10]        I believe that I am being held unlawfully on the fol-
lowing ground:


(A) Ground one:  On March 23, 1989, petitioner was indicted for the


-2-

of se of AGG CRI SEX ASSAULT pursuant to Capt 38 §12-14-A(3). in e Circuit Court of the Sixth District. Through testimony of the alleged victims, in case number **95-CR-1411801**, it was demonstrated that the assaults took place in the State of Indiana and not the State of Illinois, thus the Circuit Court was without jurisdiction to accept the petitioner's plea of guilt; or to prosecute the petitioner in the State of Illinois. **People ex rel. Merril v. Hazard**, 361 Ill. 60, 196 N.E. 827 (1935)

In case number **89-CR-06784**, the alleged victim testified to the fact that she and the petitioner drove over from the Illinois border too the Indiana border and that the alleged assault took place over the tracks; which is the State of Indiana. **(See Exhibit #1)**

In case number **89-CR-06782**, the alleged victim also testified to the fact that the assault took place in Beer Can Alley which is in the State of Indiana. **(See Exhibit #2)**

In case number **89-CR-06783**, the alleged victim also testified to the fact that she and the petitioner drove over from the Illinois border too the Indiana border and that the alleged assault took place over the tracks; which is the State of Indiana. **(See Exhibit #3)**

Petitioner argues that, a habeas petitioner may appeal any prior conviction that was used to enhance a sentence or gain a

-3-

conviction, even if that conviction sentence has expired. **Clay v. McBride**, 946 F.Supp. 639; **Tredway v. Farley**, 35 F.3d 288, 292; **Crank v. Duckworth**, 905 F.2d 1090. In the case at bar, the three above cases were used to enhance the petitioner's sentence in case number **95-CR-1411801** and one was used to gain a conviction in said case. Petitioner now argues that through the testimoney used at his trial in case number **95-CR-1411801**, is has been demonstrated that the alleged offenses committed in case numbers **89-CR-06782, 83,** and **84,** said offenses were committed in the State of Indiana, and the State of Illinois was without any jurisdiction to prosecute and or accept a plea of guilt from the petitioner.

Jurisdiction of the subject matter is the power of a court to hear and determine causes of the general class to which the proceeding in question belongs, and such jurisdiction is always conferred only by law. In its application to a certain controversy, jurisdiction means the power and authority to hear and determine the issue involved in the cause. **Woodward v. Ruel**, 355 Ill. 163, 188 N.E. 911; **People v. Ford**, 289 Ill. 550, 124 N.E. 549. Thus; since the circuit court lacked jurisdiction over the case at bar, the judgment is void. It is well established, that where the judg- ment and conviction is entirely void a discharge should be granted. **People v. Whitson**, 74 Ill. 20; **People v. Foster**, 104 Ill. 156. In the case at bar, the petitioner is entitled to a writ of habeas corpus; where the defects are so radical as to render the judgment absolutely void. **People v. Allen**, 160 Ill. 400, 43 N.E. 332.

[11]      Petitioner has a Motion to Withdraw his guilty plea

currently pending ( ) the Circuit Court of Cook County, and is att-
ached hereto as appendix #A.


   **WHEREFORE**, petitioner prays that a Petition Of Habeas
Corpus directed to the respondent above named, issued for the pur-
pose of inquiring into the cause of the imprisonment and restraint
of the petitioner, and the delivering him therefrom, pursuant to
law.


                              Respectfully Submitted

                              *Theodore Luczak*
                              Theodore Luczak **Pro-Se**;
                              Reg No:#B-00780
                              Pontiac Correctional Center



                       **AFFIDAVIT**


   I, Theodore Luczak, deposes and says that as to the
petition herein, he is the petitioner in the above entitled cause;
that he has read the foregoing documents, by him signed and that
the statements contained therein are true in substance and in fact.


                              Respectfully Yours

                              *Theodore Luczak*
                              Theodore Luczak **Pro-Se**;



                         –5–

Denial of Petition In Circuit Court

Appendix #B.

**DOROTHY BROWN**
CLERK OF THE CIRCUIT COURT

( )



( )

**CRIMINAL BUREAU**
2650 S. California
Room 526
Chicago, Illinois 60608
(773) 869-3141
FAX (773) 869-4444
www.cookcountyclerkofcourt.org

## OFFICE OF THE CLERK OF THE CIRCUIT COURT OF COOK COUNTY

18 December 2006

Mr. Theodore Luczak
Reg. No B00780
Stateville Correction Center
P.O. Box 112
Joliet, Illinois 60434

Re: Criminal Cases - 89 CR 06782 - 89 CR 06783 – 89CR 06784

Dear Mr. Luczak:

The letter that you sent to the Appellate Court, dated 4 December 2006, was forwarded to the Criminal Division of the Clerk of the Circuit Court's Office for further review. As previously stated in my letter dated 8 December 2006, the court file jacket will be reviewed to determine if a copy of the Notice of Appeal, dated 18 August 2006 is in the court file. Or alternatively, you may submit a copy of the previously filed Notice of Appeal for processing.

In your letter, you allege that the habeas corpus petition was "......never placed on the court's call line and/or docket." The petition was scheduled for a hearing before Judge John J. Mannion, in Court Room 107, located in the Bridgeview court facility. That hearing took place on 19 July 2006 and is reflected in the copy of the document that was enclosed with your letter. I have enclosed a copy of the Electronic Docket which confirms that the court denied your petition.

Questions and further inquires related to this matter should direct to Leo Lastre, Chief Deputy Clerk of the Criminal Division. Mr. Lastre office is located a 2600 S. California Avenue, Chicago, Illinois 60608

Respectfully,

Dennis R. Mc Namara
Associate Clerk – Criminal Bureau

cc:     Cindy Wile
        Bernadette Freeman
        Leo Lastre
        Appeal Team
        Correspondence File

Dec nber 20, 2006, 16:43:22
(A) p410 - PASSPORT     ( )

CASE: 89CR0678301 S  (START OF FELONY CASE)      PAGE: 013 OF  014      PROD
  DEFENDANT NAME: THEODORE      LUCZAK
122805-
COMMON LAW RECORD PREPARED      000000
      1VOL
CLERK'S OFFICE


011206-
CLR RECD BY APP COUNSEL      000000
      PUBLIC DEFENDER - ONE VOLUME
CLERK'S OFFICE


071906-
HABEAS CORPUS PETITION DENIED      000000
MANNION, JOHN J.
ROOM 107


120606-
SUPPLEMENTAL CLR PREPARED      000000
      ONE VOLUME
CLERK'S OFFICE

ENTER=CONTINUE PF3=RETURN PF7=BKWRD PF8=FRWD PF10=RESET PF12=PRINT CLEAR=EXIT
=> PRINT THE FOLLOWING PAGES PAGE: 001 THRU 014 DESTINATION ____

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 89CR0678201

THEODROE     LUCZAK

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION with the Clerk of the Circuit Court.

Charging the above named defendant with:

| | | |
|---|---|---|
| 38-12-14-A(3) | F | AGG CRIM SEX ASSAULT |
| 38-12-14-A(3) | F | AGG CRIM SEX ASSAULT |
| 38-12-13-A(1) | F | CRIM SEXUAL ASSAULT |
| 38-12-13-A(1) | F | CRIM SEXUAL ASSAULT |
| 38-10-2-A(3) | F | AGGRAVATED KIDNAPPING |
| 38-12-16-D | F | AGG CRIM SEX ABUSE |
| 38-12-16-D | F | AGG CRIM SEX ABUSE |
| 38-10-3-A | F | UNLAWFUL RESTRAINT |

The following disposition(s) was/were rendered before the Honorable Judge(s):

03/23/89 IND/INFO-CLK OFFICE-PRES JUDGE          04/07/89 1701
    FITZGERALD, THOMAS R.
04/07/89 DEFENDANT ARRAIGNED
    BASTONE, ROBERT P.
04/07/89 PLEA OF NOT GUILTY
    BASTONE, ROBERT P.
04/07/89 CASE ASSIGNED                           04/14/89 6713
    BASTONE, ROBERT P.
04/14/89 CONTINUANCE BY AGREEMENT                04/20/89
    MANNION, JOHN J.
04/20/89 CONTINUANCE BY AGREEMENT                05/25/89
    MANNION, JOHN J.
05/25/89 CONTINUANCE BY AGREEMENT                06/21/89
    MANNION, JOHN J.
06/21/89 MOTION DEFT - CONTINUANCE - MD          07/06/89
    MANNION, JOHN J.
07/06/89 CONTINUANCE BY ORDER OF COURT           07/07/89
    MANNION, JOHN J.
07/07/89 CONTINUANCE BY AGREEMENT                07/21/89
    MANNION, JOHN J.
07/21/89 CONTINUANCE BY AGREEMENT                08/17/89
    MANNION, JOHN J.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 002

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 89CR0678201

      THEODROE      LUCZAK

        CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
08/17/89 MOTION DEFT - CONTINUANCE - MD         08/31/89
      MEEKINS, FRANK W.
08/31/89 CONTINUANCE BY AGREEMENT               09/28/89
      MANNION, JOHN J.
09/28/89 CONTINUANCE BY AGREEMENT               10/17/89
      MANNION, JOHN J.
10/17/89 CONTINUANCE BY AGREEMENT               11/13/89
      MANNION, JOHN J.
11/13/89 CONTINUANCE BY AGREEMENT               12/08/89
      MANNION, JOHN J.
12/08/89 CONTINUANCE BY AGREEMENT               01/17/90
      MANNION, JOHN J.
01/17/90 CONTINUANCE BY AGREEMENT               02/02/90
      MANNION, JOHN J.
02/02/90 PG JW FINDING GUILTY         C001
      MANNION, JOHN J.
02/02/90 PG JW FINDING GUILTY         C002
      MANNION, JOHN J.
02/02/90 NOLLE PROSEQUI               C003
      MANNION, JOHN J.
02/02/90 NOLLE PROSEQUI               C004
      MANNION, JOHN J.
02/02/90 NOLLE PROSEQUI               C005
      MANNION, JOHN J.
02/02/90 NOLLE PROSEQUI               C006
      MANNION, JOHN J.
02/02/90 NOLLE PROSEQUI               C007
      MANNION, JOHN J.
02/02/90 NOLLE PROSEQUI               C008
      MANNION, JOHN J.
02/02/90 DEF DEMAND FOR TRIAL
      MANNION, JOHN J.
02/02/90 DEF SENTENCED ILLINOIS DOC   C001
      EACH COUNT CONCURRENT
            10 YRS
      MANNION, JOHN J.
02/02/90 DEF SENTENCED ILLINOIS DOC   C002
            10 YRS
      MANNION, JOHN J.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS        Page 003

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 89CR0678201

THEODROE    LUCZAK

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
02/02/90 CREDIT DEFENDANT FOR TIME SERV
        CREDIT FOR 339 DAYS SERVED
        MANNION, JOHN J.
03/04/05 SPECIAL ORDER                              00/00/00
        JAIL MAIL MOTION - DENIED
        MANNION, JOHN J.
06/24/05 NOTICE OF APPEAL FILED, TRNSFR             00/00/00
06/27/05 HEARING DATE ASSIGNED                      07/01/05 1713
07/01/05 SPECIAL ORDER                              00/00/00
        LATE NOTICE OF APPEAL DENIED
        BIEBEL, PAUL JR.
08/04/05 NOTICE OF APPEAL FILED, TRNSFR             00/00/00
08/09/05 NOTICE OF NOTICE OF APP MAILED             00/00/00
08/09/05 HEARING DATE ASSIGNED                      08/12/05 1713
08/12/05 PUBLIC DEF APPTD FOR APPEAL                00/00/00
        BIEBEL, PAUL JR.
08/12/05 O/C FREE REPT OF PROCD ORD N/C             00/00/00
        BIEBEL, PAUL JR.
08/12/05 MEMO OF ORDS & NOA PICKED-UP               00/00/00
        BIEBEL, PAUL JR.
08/25/05 APPELLATE COURT NUMBER ASGND          ☛    00/00/00 05-2377
12/07/05 REPT OF PRCDS ORD FR CRT RPT               00/00/00
12/28/05 COMMON LAW RECORD PREPARED                 00/00/00
        1VOL
01/12/06 CLR RECD BY APP COUNSEL                    00/00/00
        PUBLIC DEFENDER - ONE VOLUME
02/27/06 CONTINUANCE BY AGREEMENT                   03/10/06 6715
        MANNION, JOHN J.
03/10/06 DEFENDANT IN CUSTODY                       00/00/00
        IDOC       890
        MANNION, JOHN J.
03/10/06 CONT FOR STATUS OR PROG REPT               06/09/06 6715
        MANNION, JOHN J.
06/09/06 DEFENDANT IN CUSTODY                       00/00/00
        MANNION, JOHN J.
06/09/06 PRISONER DATA SHEET TO ISSUE               00/00/00
        MANNION, JOHN J.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 004

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 89CR0678201

THEODROE    LUCZAK

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
06/09/06 CONT FOR STATUS OR PROG REPT          09/08/06 6715
       MANNION, JOHN J.
07/19/06 HABEAS CORPUS PETITION DENIED          00/00/00
       MANNION, JOHN J.
09/08/06 SPECIAL ORDER                          00/00/00
       ON CALL IN ERROR
       MANNION, JOHN J.

I hereby certify that the foregoing has been entered of record on the above captioned case.
Date 11/01/06

_____
                  DOROTHY BROWN
CLERK OF THE CIRCUIT COURT OF COOK COUNTY

Notice of Appeal

Appendix # C.

IN THE
CIRCUIT COURT OF COOK COUNTY, ILLINOIS
SIXTH JUDICIAL CIRCUIT

| | |
|---|---|
| Theodore Luczak #B-00780 | ) |
| | ) |
| **Petitioner** | ) |
| | ) |
| | ) |
| | ) |
| .vs. | ) Case No: 89-CR-06782 |
| | )                89-CR-06783 |
| | )                89-CR-06784 |
| | ) |
| Eddie Jones | ) Honorable |
| | ) **JOHN J. MANNION** |
| **Respondent,** | ) Judge Presiding |

## NOTICE OF APPEAL

An appeal is taken from the **Order** or **Judgment** described below:

**[1]**    Theodore Luczak, **pro-se;** appellant is appearing pro-se; and notice shall be sent to: Reg No:#B-00780. Pontiac Correctional Center. 700 West. Lincoln St./P.O. Box 99. Pontiac, Illinois 61764.

**[2]**    An appeal is being taken to the Illinois Appellate Court, First District.

**[3]**    On April 05, 2006, the appellant filed a **State Habeas Corpus** pursuant to **735 ILCS §§5/10-102 5/2-1401**, as the circuit court lacked any jurisdiction over the cause of action.

-1-

[4]    It has been well over thirty(30) days since the appellant has mailed his proceeding to the clerk of the court; and as of the drafting of this notice, the clerk has refused to file and or send the appellant a stamp filed copy of his proceeding.

[5]    The appellant has a meritorious claim before the court, as the record clearly demonstrates that the crime in this cause of action has occured in the State of Indiana; and that the State of Illinois was without jurisdiction over the matter.

Dated: **May 05, 2006.**

Respectfully Yours

*Theodore Luczak*

Theodore Luczak **Pro-Se;**
Reg No:#B-00780
Pontiac Correctional Center
700 West. Lincoln St.?P.O. Box 99
Pontiac, Illinois 61764

-2-

STATE OF ILLINOIS     )
                      )SS.
COUNTY OF LIVINGSTON  )

### AFFIDAVIT OF SERVICE

I, Theodore Luczak, state that I have served a copy of the document to which this affidavit is attached, upon each party or if represented by counsel, upon the attorney of record for said party, by enclosing the same in a seald envelope plainly addressed as is disclosed by the pleadings of record herein; and by depositing the same of each said envelope in the bars designed for United States Mail at the Pontiac Correctional center. Pontiac, Illinois 61764, togather with the appropreate request to the prison officials responsible to affix fully prepaid postage thereto, on this 8th day of May 2006.

Service made on: Richard A. Devine
                 Cook County States Attorney
                 First Municiple Department
                 Richard J. Daley Center--Room 1006
                 Chicago, Illinois 60602

I, Theodore Luczak, the undersigned, certify and state that:

[1]     I am the appellant in the attached cause of action.

[2]     I have read the foregoing **Notice of Appeal**, and have knowledge of its contents.

[3]     Under penalties provided by law, pursuant to **735 ILCS §1-109** of the Civil Code of Procedures, I certify that the statement set forth in this proceeding and affidavit are true and correct.

Respectfully Submitted

*Theodore Luczak*

Theodore Luczak **Pro-Se;**
Reg No:#B-00780

Extension of Time To File Record On Appeal

Appendix #D

No. 06-3645

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| People State of Illinois | ] Appeal from the Circuit Court |
|---|---|
| Plaintiff-Appellee, | ] of Cook County, Illinois |
| | ] |
| | ] |
| .vs. | ] Cir. Ct. No. 89-CR-6782 |
| | ] Honorable |
| Theodore Luczak | ] John Mannion |
| Defendant-Appellant. | ] Judge Presiding |

NOTICE AND PROOF OF SERVICE

To:          Richard A. Devine
             State's Attorney of Cook County
             309 Richard J. Daley Center
             Chicago, Illinois 60602

Please take notice that on March 12, 2007, I have placed in the U.S. mail at the Stateville Correctional Center, one (1) original and four (4) copies of a Motion for Extension of Time and Docketing Statement, a copy of which is attached hereto and herewith served upon you.

15/01/ _(signature)_

Theodore Luczak

No: 06-3645

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | |
|---|---|
| People State of Illinois<br>　　　Plaintiff-Appellee,<br><br>　　　. vs .<br><br>Theodore Luczak<br>　　　Defendant-Appellant, | Appeal from the Circuit Court<br>of Cook County, Illinois<br><br>Cir. Ct. No. 89-CR-6782<br>Honorable<br>John Mannion<br>Judge Presiding |

MOTION FOR EXTENSION
OF TIME IN WHICH TO FILE THE RECORD ON APPEAL

The Defendant-Appellant, Theodore Luczak, pro-se, respectfully moves this Honorable Court, pursuant to Supreme Court Rule 343(c), asks this Honorable Court for an extension of time to and including March 30, 2007, for the filing of the Record in this cause of action. The defendant-Appellant state's the following in support of his Motion.

1.)　　This is an appeal from the dismissal of a State Habeas Corpus Petition.

- 1 -

2.)    Defendant was charged with aggravated criminal sexual assault; aggravated kidnapping; aggravated criminal sexual abuse, and unlawful restraint under Indictment No. 89-CR-6782.

3.)    Defendant was convicted of aggravated criminal sexual assault; and was sentenced to ten (10) years imprisonment in the Illinois Department of Corrections.

4.)    That on July 19, 2006, defendant-appellants State Habeas Petition was summarily dismissed.

5.)    Defendant is currently incarcerated at the State-ville Correctional Center.

6.)    Notice of Appeal was filed on August 18, 2006.

7.)    The record on this appeal is now due, but the clerk of the court has failed to file the record in the appellate court first district.

THEREFORE, defendant-appellant respectfully

request an extension of time to and including March 30. 2007. in which to file the record on appeal.

/s/ Theodore Luczak
Theodore Luczak Pro-Se.
Reg No: B-00780

No. 06 - 3645

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | |
|---|---|
| People State of Illinois<br>Plaintiff - Appellee, | Appeal from Cook County<br>Cir. Ct. No. 89 - CR - 6782<br>Notice of Appeal: 8/18/06<br>Trial Judge: John Mannion<br>Felony<br>In Custody |
| . vs . | |
| Theodore Luczak<br>Defendant - Appellant, | |

DOCKETING STATEMENT
( Criminal )

Counsel on Appeal
For Appellant
Theodore Luczak Pro-Se:
Reg No: B-00780
Stateville Correctional Center
Route 53, Post Office Box 112
Joliet, Illinois 60434

Counsel on Appeal
For Appellee(s)

- 1 -

Richard A. Devine
State's Attorney
300 Daley Center
Chicago, Illinois 60602

Court Reporter(s)
Defendant - Appellant has not been provided a copy of the report of proceeding in this cause of action.

Nature of Case
(v) Guilty Plea

General Statement of issues proposed to be raised.
The sentencing court had no jurisdiction to true and/or accept a guilty plea, as the offense charged was committed in the State of Indiana.

I, Theodore Luczak, pro-se, defendant-appellant, hereby certify that on August 18, 2006, I asked the clerk of the circuit court to prepare the record, and on August 18, 2006, I also made a written request to the court reporters

- 2 -

office to prepare the transcript(s). The attached transcripts,
I am requesting to be made part of the record.

March 12, 2007                          /s/ Theadore Lucyak
                                            Defendant Pro-Se,


I hereby acknowledge receipt of an order for the prepar-
ation of a report of proceedings.


_____                _____
Date                                   Court Reporter or Supervisor


STEVEN M. RAVID CLERK OF THE APPELLATE COURT 1st DISTRIC

- 3 -

STATE OF ILLINOIS )
                  )SS.
COUNTY OF WILL    )

## AFFIDAVIT

  Theodore Luczak, being first duly sworn on oath, deposes and says that affiant is appearing pro-se, that affiant has read the foregoing Motion and Docketing Statement by me subscribed; that affiant knows the contents therein; and that upon information available to him the same is true in substance and in fact.

  Pursuant to 735 ILCS 5/109, I declare under penalty of perjury, that everything contained herein is true and accurate to the best of my knowledge and belief. I further declare and affirm, that the matter at hand is not taken either frivolously or maliciously, and that I believe the foregoing matter is taken in good faith.

    /s/ Theodore Luczak
    Theodore Luczak Pro-Se,

Letter Requesting Clerk To File Record
On Appeal


Appendix # E

Reg No. B-00780
Stateville Correctional Center
Route 53 Post Office Box 112
Joliet, Illinois 60434

May 10, 2007.

Dorothy Brown
Clerk of the Circuit Court of Cook County
County Department - Criminal Division
2650 S. California Ave, 5th Floor
Chicago, Illinois 60608

RE: Appeal 06-3645

Dear Miss/Mrs. Brown:

I am writing you this letter, in which to request to know if your office has sent the record on the above appeal, to the clerk's office at the Appellate Court 1st District. Illinois Supreme Court Rule 324 mandates that you do so.

1S/ Theadore Luczak
Theadore Luczak

c.c./filed.

DOROTHY BROWN
CLERK OF CIRCUIT COURT
CRIMINAL DIVISION
CLERK OF CIRCUIT COURT

2007 MAY 14 PM 2:34

RECEIVED

Order of Appellate Court Dismissing Appeal

Appendix #F

IN THE APPELLATE COURT, STATE OF ILLINOIS
FIRST DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,    )
    )
    Plaintiff-Appellee,    )
    )
v.    )    No. 06-3645
    )
THEODORE LUCZAK,    )
    )
    Defendant-Appellant.    )
    )
    )
    )
    )
    )

# O R D E R

On the Court's own motion, the Defendant-Appellant having been given two extensions of time to file the record on appeal; the record on appeal having been originally due by September 8, 2006; no record on appeal having been filed;

**IT IS HEREBY ORDERED** that this appeal is DISMISSED FOR WANT OF PROSECUTION.

**ORDER ENTERED**

MAY 1 8 2007

APPELLATE COURT, FIRST DISTRICT

_____ JUSTICE

_____ JUSTICE

_____ JUSTICE

Writ of Habeas Corpus to Illinois Supreme Court

Appendix # G



# SUPREME COURT OF ILLINOIS
SUPREME COURT BUILDING
SPRINGFIELD 62701

August 9, 2007

**JULEANN HORNYAK**
CLERK OF THE COURT
(217) 782-2035

TELECOMMUNICATIONS DEVICE
FOR THE DEAF
(217) 524-8132

**FIRST DISTRICT OFFICE**
20TH FLOOR
160 N. LASALLE ST.
CHICAGO 60601
(312) 793-1332

TELECOMMUNICATIONS DEVICE
FOR THE DEAF
(312) 793-6185

Mr. Theodore Luczak
Reg. No. B-00780
Stateville Correctional Center
P. O. Box 112
Joliet, Illinois  60434

    Re: M11908 -  Theodore Luczak, petitioner, v. Terry McCann, etc., respondent. Habeas Corpus.

Dear Mr. Luczak:

This office has today filed your motion for leave to file a petition for writ of habeas corpus, styled as set forth above.  You are being permitted to proceed as a poor person.

Your motion will be referred to the Court, and you will be advised as to the action taken.

In accordance with your request, we are returning with this letter a file-stamped copy of your motion.

    Very truly yours,

*Juleann Hornyak*
Clerk of the Supreme Court

JH/jak
Enclosure
cc:   AG CrMadigan

NO. **11908**

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| Theodore Luczak, | ) | Habeas Corpus |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Terry McCann, Warden of Stateville | ) | |
| Correctional Center, | ) | |
| | ) | |
| Respondent | ) | |

## MOTION BY PETITIONER FOR LEAVE TO FILE A
## PETITION FOR WRIT OF HABEAS CORPUS

**FILED**

AUG 9 – 2007

SUPREME COURT
CLERK

Theodore Luczak
Reg. No. B-00780
Stateville Correctional Center
P. O. Box 112
Joliet, Illinois 60434

IN THE

ILLINOIS SUPREME COURT

| | |
|---|---|
| Theodore Luczak<br>　　　Petitioner-Appellant, | Appeal from the Circuit Court of<br>Cook County, Illinois |
| ·vs· | Indict No: 89-CR-06782, 83 and 84.<br>Appeal No: |
| ~~Guy D. Pierce~~<br>　　　Respondent-Appellee | Honorable<br>John J. Mannion<br>Judge Presiding |

HABEAS CORPUS PETITION

SUPREME COURT RULE 381

ARTICLE VI. SECTION 4(A) OF THE CONSTITUTION

To: Illinois Supreme Court.

　　The petition of, Theodore Luczak, for Habeas Corpus pursuant to Supreme Court Rule 381, and Article VI, section 4(A) of the Illinois Constitution.

## FACTUAL BACKGROUND

Following a jury trial, petitioner was convicted on two counts of aggravated criminal sexual assault. Prior to trial, the State moved to introduce evidence of petitioner's prior crime, arguing that evidence of the other crime established petitioner's criminal intent at the time of the charged crime and petitioner's modus operandi. Over objection, the trial court granted the States motion, and stated that the evidence of the other crime demonstrated petitioner's modus operandi and criminal intent.

At trial, the alleged victim testified to the fact that the assault took place in Beer Can Alley, which is in the State of Indiana. (T.R. D-173-187)

## PROCEDURAL HISTORY

On July 7, 1997, petitioner, represented by an appointed Public Defender of Cook County, filed his Direct Appeal that was affirmed by the Appellate Court First District on June 14, 1999. People v. Luczak, 306 Ill.App.3d 319, 714 N.E.2d 995.

On July 13, 1999, petitioner filed a pro se petition for Leave to Appeal to the Illinois Supreme Court, that was denied on October 6, 1999, pursuant to Illinois Supreme Court Rule 23.

2

On November 23, 1999, petitioner filed a pro se, Writ of Certiorari to the United States Supreme Court. The United States Supreme Court denied petitioner's writ on February 22, 2000. People v. Luczak, 528 U.S. 1164.

On March 27, 2000, petitioner filed a pro se Petition for Post-Conviction Relief, that was subsequently denied in the Circuit of Cook County on April 6, 2000.

On April 5, 2001, petitioner's appointed attorney for his post conviction appeal, filed a motion to withdraw as counsel pursuant to Pennsylvania v. Finley, and petitioner filed his responce to counsel's motion to withdraw on May 22, 2001. On June 25, 2001, in an unpublished order, the Appellate Court found no issues of arguable merits, granted the appointed attorney's motion to withdraw as counsel and affirmed the judgment of the circuit court.

Petitioner filed his second pro se petition for leave to appeal to the Illinois State Supreme Court on August 6, 2001, that was subsequently denied on October 3, 2001, in an unpublished order.

On January 14, 2002, petitioner filed a pro se writ of habeas corpus in the United States District Court for the Northern District of Illinois, that was subsequently denied on March 24, 2003.

Petitioner also has a petition for leave to appeal currently pending before this Honorable Court for the denial of his motion

requesting DNA testing pursuant to 116-3.

A. Ground One:

On March 23, 1989, petitioner was indicted for the offense of Aggravated Criminal Sexual Assault, pursuant to Chapter 38 §12-14-A(3), in the Circuit Court of the Sixth Judicial District. On February 2, 1990, petitioner entered a plea of guilt in case number's 89-CR-06782, 89-CR-06783, and 89-CR-06784, through trial testimony in case number 95-CR-141180; it was demonstrated that the assaults in case number's 89-CR-06782, 06783, and 06784 took place in the State of Indiana and not the State of Illinois, thus the Circuit Court was without jurisdiction to accept the petitioner's plea of guilt, or to prosecute the petitioner in the State of Illinois. <u>People ex rel. Merril v. Hazard</u>, 361 Ill. 60, 196 N.E. 827 (1935).

In case number 89-CR-06784, the alleged victim testified to the fact that she and the petitioner drove over the Illinois border and that the assault took place in Beer Can Alley, which is in the State of Indiana. (See Appendix #A)

In case number 89-CR-06783, the alleged victim testified to the fact that she and petitioner drove over the Illinois border and that the assault took place in Beer Can Alley, which is in the State of Indiana. (See Appendix #B)

In case number 89-CR-06782, the alleged victim testified to the fact that she and the petitioner drove over the Illinois border and that the assault took place in Beer Can Alley, which is in the State of Indiana. (See Appendix #C)

At sentencing, the State moved the court to enhance the petitioner's sentence based on the convictions in case numbers 89-CR-06782, 06783, and 06784.

A petitioner may appeal any prior conviction that was used to enhance a sentence or gain a conviction, even if that conviction and sentence has expired. Clay v. McBride, 946 F.Supp. 639; Tredway v. Farley, 35 F.3d 288, 292; Crank v. Duckworth, 905 F.2d 1090.

Jurisdiction of the subject matter is the power of a court to hear and determine causes of the general class to which the proceeding in question belongs, and such jurisdiction is always conferred only by law. In its application to a certain controversy, jurisdiction means the power and authority to hear and determine the issue involved in the case. Woodward v. Ruel, 355 Ill. 163, 188 N.E. 911; People v. Ford, 289 Ill. 550, 124 N.E. 549. Thus, since the circuit court lacked jurisdiction over the above three cases, the judgment is void. It is well established, that where the judgment and conviction is entirely

void a discharge should be granted. People v. Whitson, 74 Ill. 20, People v. Foster, 104 Ill. 156. In the case at bar, the the petitioner is entitled to a writ of habeas corpus, where the defects are so radical as to render the judgment absolutely void. People v. Allen, 160 Ill. 400, 43 N.E. 332.

Upon the filing of the instant petition of habeas corpus in the circuit court, the circuit court was so bias and prejudice against the petitioner, the circuit court deliberately violated every court rule and State Constitutional Amendment in relation to the normal proceedings of a habeas corpus, as the circuit court never even placed the petition on the courts docket, or provided petitioner summonse's to adequately serve the respondent a copy of the petition. The certified statement of conviction/disposition clearly demonstrates that the circuit court received and denied the petition on the same day. (See Appendix #A)

Upon appeal, the first district appellate court adopted the practice of continously being bias and prejudice against the petitioner, as the appellate court dismissed the petitioner's appeal because the clerk of the circuit court refused to file the record on appeal. The clerk of the circuit court of cook county has refused to perform any of her duties in relation to any of the petitioner's appeals. (See Appendix #B) In an attempt to correct and/or curb

the unconstitutional actions of the clerk. the petitioner wrote and informed Honorable Rod R. Blagojevich of such actions (See Exhibit #1) The petitioner has even filed three (3) Petition of Mandamus' in this court; requesting the court to direct the clerk of the circuit court to ad-hear to the rules upon appeal. all to no avail as all ~~hear~~ three (3) Mandamus' have been denied.

The appellate court first district has been bias and prejudice against the petitioner on every appeal filed; and every appeal filed was assigned to O'Mara Forssard; Tully and Gallagher; and every oppion has been presented with bias and prejudice against the petitioner denying his appeal, all because the above three justice's are the victim of related criminal offences, or are related to a person who is a victim of a crime that is similer to the petitioner's.

## CONCLUSION

WHEREFORE, the petition for writ of habeas corpus should be granted as the judgment is absolutely void.

Respectfully Submitted

*Theodore Luczak*

Theodore Luczak

STATE OF ILLINOIS )
) SS.
COUNTY OF WILL )

# AFFIDAVIT

I, Theodore Luczak, being first duly sworn on oath deposes and states as follows:

1. That I am an inmate of the Illinois Department of Corrections, currently confined at the Stateville Correctional Center, located at Route 53, Post Office Box 112, Joliet, Illinois 60434.

2. That on July 15, 2006, I caused to be filed, a petition for writ of habeas corpus togather with a request for summons.

3. That on July 19, 2006, the circuit court denied m petition sua spontainaly.

4. That on August 18, 2006, I filed my notice of appea togather with a request to the court reporters office and the clerk of the court, requesting that the record be prepared and filed in the appellate court

5.       That on March 12, 2007, I filed my first motion for extension of time to file the record on appeal, and once again notified the clerk of the court to file the record on appeal.

6.       That on March 30, 2007, I filed my second motion for extension of time to file the record on appeal, and I once again notified the clerk of the court to file the record on appeal.

7.       That the prison officials are impeding and frustrating the process of my criminal appeal, and upon requesting the appellate court for a court order requiring prison officials to afford me adequate and meaningful access to courts, the appellate court denied such request on October 10, 2006.

8.       That due to the prison officials denying me adequate and meaningful access to courts, I am unable to fully litigate and present an argument to the Illinois Supreme Court, because I am only given ten(10) sheets of typing paper each month.

9.    That the petitioner has filed a proceeding in all three (3) State Court systems. Seeking to have the clerk of the Circuit Court of Cook County to adhear to the rules of the appellate procedures.

Further Affant Sayeth Not.

Pursuant to 735 ILCS 5/109. I declare under penalty of perjury, that everything contained herein is true and accurate to the best of my knowledge and belief. I further declare and affirm, that the matter at hand is not being taken either frivolously nor maliciously and that I believe the foregoing matter is being taken in good faith.

Is/ Theadore Lucyed
Affant.

– C –